```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
                ------------------------------x

                WESCO INSURANCE COMPANY,
                et al.,

                              Plaintiffs,

                         v.                        18 CV 3771 (PGG)(OTW)
                                                   Remote Conference
                PERSONNEL STAFFING GROUP, LLC,

                              Defendant.
                ------------------------------x
                                                   New York, N.Y.
                                                   March 2, 2021
                                                   11:00 a.m.
                Before:

                                    HON. ONA T. WANG,

                                                   Magistrate Judge

                                       APPEARANCES

                FREEBORN & PETERS LLP
                     Attorneys for Plaintiffs
                BY:  ANDREW J. COSTIGAN

                SPERLING & SLATER PC
                     Attorneys for Defendant
                BY:  NATHAN ANDREW SHEV
                     -and-
                TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP
                BY:  CARL FREDERICK REGELMANN
```

         (The Court and all parties appearing telephonically)

         (Case called)

         MR. COSTIGAN:  This is Andrew Costigan, appearing for the plaintiffs.

         MR. SHEV:  This is Nathan Shev, appearing for Defendant PSG.

         MR. REGELMANN:  This is Carl Regelmann, for Defendant PSG.

         THE COURT:  All right.  Good morning, everyone.

         We are here for a status conference.  We are proceeding by telephone due to the COVID-19 pandemic.  This is a public line and should be treated like my virtual courtroom.  I expect the same decorum on the line that I expect in my courtroom, although, having had several settlement conferences with you all, I don't expect this to be a problem with you.  And because this is a public line, we should all expect that members of the press or public may be on the line on a listen-only basis.

         We do have a court reporter on the line; that is Mr. Walker.  He may interrupt from time to time if he can't hear you or if somebody is speaking too quickly.  And at the end of the conference, I am going to request that the parties order a copy of the transcript and share the cost so that we can all literally be on the same page.

         As Mr. Walker may have let you know, but I will remind

1  you all, any recording or rebroadcasting by anyone else on this
2  line is strictly prohibited.  Please stay on mute when you're
3  not talking so that we have as clear a transcript as possible.
4  Please say your name when you start speaking, and, obviously,
5  please don't interrupt each other.
6          I will also add, although this may not be the case
7  with today's conference, that I do generally encourage junior
8  or less experienced attorneys to speak, and I place no limit on
9  the number of attorneys who can speak at the conference.
10         We had held several settlement calls last fall and
11 this winter, until it became clear that the parties may need
12 some more discovery before potentially talking about settlement
13 again or in order to move forward in the case on its merits.
14         I have reviewed your joint status letter, and there
15 seemed to be globally two issues.  One is whether, and how
16 much, discovery should be taken from PSG, who's the defendant,
17 and the breadth and the scope of the anticipated subpoenas to
18 third parties.
19         I will say that, in preparation for this conference, I
20 was going over my notes from both our settlement conferences
21 but then actually going all the way back to our last public
22 conference in the summer of 2020, and this feels a little bit
23 like Groundhog Day because it seems like we were talking about
24 these same issues, in other words, whether there was certain
25 discovery still to be gotten from PSG — I understand PSG is

objecting — and then also, if we're talking about subpoenas there is likely some kind of objection to the breadth and the scope.

So, before I ask either side to speak, I just wanted to confirm the following: Because I know we've gone over a lot of ground in private on the settlement conferences, when we do talk about end clients, maybe somebody can start and talk about whether we're all on the same page as to what the definition of end client is in this context, and if it's really the discovery from the end clients about the employees and where they were placed that is really what plaintiff is trying to get at this point.

Mr. Costigan, you can go first. Thank you.

MR. COSTIGAN: Yes. This is Andrew Costigan. Thank you, your Honor.

Ultimately, I don't anticipate that we will need discovery from end clients. We do have a somewhat complicated chain here because PSG places its employees with end clients, some just on its own, clients of its own, and we have that production. And then there is also the issue of the majority of its employees being placed by other staffing companies with end clients of those staffing companies, and that information we don't have.

One complicating issue is that there's another set of employees who are placed by staffing companies who themselves

were contacted by a staffing company other than PSG.  And there are additional links in the chain, potentially, where an employee is essentially getting business from a staffing company other than the staffing company directly in contact with PSG and in place for that staffing company's clients.

THE COURT:  All right.

How many employees are we talking about here?

MR. COSTIGAN:  Well, it's in the ballpark of, I believe, 29,000 -- I'm sorry, 39,000, and about three-quarters of those, or about 29,000, are at issue in terms of being placed by staffing companies other than PSG.

THE COURT:  Okay, all right.

Can I hear from defendants about just whether this is the general understanding of what the discovery that is still remaining, please?

MR. SHEV:  Yes, your Honor.  This is Nathan Shev, for PSG.

That is the general understanding.  The end client is the entity that receives the staffing employee for work, and the issue is that PSG, because they don't place the staffing employee for -- they don't place all the staffing employees themselves directly; some are placed by third parties, they don't have the identities of those end clients.  So that's the discovery that's being sought from the staffing company that actually made the placements.

|   |   |
|---|---|
| 1 | THE COURT:  All right. |
| 2 | I guess my next question is:  Can you tell me a little |
| 3 | bit about the range, in terms of numbers of employees, that |
| 4 | these other potential subpoena recipients have placed?  Of the |
| 5 | 29,000, are the majority of them or a large number of them |
| 6 | predominantly placed by two or three potential staffing |
| 7 | companies, or is it like every potential third-party-subpoena |
| 8 | recipient placed the same number of employees, or something |
| 9 | else? |
| 10 | MR. SHEV:  Your Honor, this is Nathan Shev again. |
| 11 | It varies by staffing clients, so some are smaller |
| 12 | much smaller than others.  At one point, we discussed issuing a |
| 13 | smaller -- a subset of the subpoenas, having plaintiffs issue a |
| 14 | subset of the subpoenas.  For example, five staffing clients we |
| 15 | found would account for 28 percent, roughly, of the 29,000 |
| 16 | employees.  But it varies depending on what staffing client |
| 17 | you're talking about. |
| 18 | THE COURT:  Okay. |
| 19 | So, let's go back.  Let's take this a little bit out |
| 20 | of order from your status letter, which I'm hoping can resolve |
| 21 | some of the easier stuff, because I think the subpoena issue — |
| 22 | the forms, scope, breadth, timing all of that — is going to be |
| 23 | a little bit more complicated, but I understand that plaintiff |
| 24 | is seeking more discovery from PSG?  That's what I read from |
| 25 | the letter, but from what you're telling me right now, I'm not |

1  sure that that's still on the table.  If that's not on the
2  table anymore, let's just remove it and start talking about the
3  subpoenas.
4           MR. COSTIGAN:  Your Honor, this is Andrew Costigan.
5  It is on the table.  And our view of this is, much of this
6  discovery really should just come from PSG.  Certainly, the
7  material that they do have, they should produce instead of
8  having --
9           THE COURT:  Mr. Costigan, I'm going to interrupt you
10 right now because this is sounding like you're reading from a
11 transcript from last summer.
12          What is the discovery that you are seeking, or would
13 be seeking, now from PSG?  And how does that get you to an
14 understanding of where the remaining 29,000 employees ended up
15 getting staff?
16          MR. COSTIGAN:  Well, one of the things we're looking
17 for is the communications that PSG had with its staffing
18 companies, staffing company customers, that relate to the
19 employees and where they're being placed.
20          THE COURT:  Okay.  So why not get that from the -- I
21 understand that we may be opening a completely different can of
22 worms right now, but what I'm hearing is that PSG doesn't have
23 that information but the staffing companies might.  So, why is
24 this not duplicative and maybe more complicated than trying to
25 get that information from what we'll call PSG's staffing

1    clients?

2            MR. COSTIGAN:  This is Andrew Costigan again.

3            We're looking, in addition, for the communications

4    that PSG had with the staffing companies when it said it was

5    trying to get them to turn over this information.

6            THE COURT:  But why?  Why does that get you to the

7    ultimate information that you're trying to get?  I understand

8    you're doing this discovery on discovery.  I'm not inclined to

9    put that in front of the information about the employees and

10   the end clients.  So you have to give me a reason why that's

11   more important than talking about the subpoenas.

12           MR. COSTIGAN:  Well, ultimately, it comes down to

13   this:  The reason we have this issue in the first place is

14   because PSG told us, on their insurance application, that they

15   don't place their employees with other employers or have them

16   perform work for other businesses or subsidiaries.  Obviously,

17   the issue we're facing now wouldn't exist if those

18   representations had been true.

19           THE COURT:  Okay.

20           I thought the information that you were seeking was

21   whether certain employees had actually been misclassified so

22   that the premium that was calculated was actually incorrect.

23           MR. COSTIGAN:  Yes, we are.

24           THE COURT:  Okay.  But what you're just telling me now

25   sounds more like a breach-of-contract claim against PSG about

1  some representations underlying the contract that you had with
2  PSG, which seems like it wouldn't relate to where the employees
3  were being placed.
4         MR. COSTIGAN:  It doesn't relate to where the
5  employees are being placed, but we are looking for information
6  that explains the breach of contract, and we're looking for an
7  explanation of PSG's corporate relationship with the companies
8  that it represented on the insurance application were d/b/a's
9  of itself.  And we're also looking to get the communications
10 between PSG and its insurance agent about the scope of the
11 insurance contracts that were issued because when PSG issued
12 insurance certificates to other staffing companies and to its
13 own clients, it was misrepresenting the scope of the insurance,
14 including provisions that don't exist in our policies.
15        MR. SHEV:  Your Honor, may I interject?
16        THE COURT:  Go ahead.
17        MR. SHEV:  This is Nathan Shev.
18        Most of what I'm hearing is pretty new to me.  It was
19 not raised at all in the complaint, or in discovery, or even
20 more recently.  Much of this we're hearing for the first time
21 now or for the first time in the past month and a half, since
22 around the time of the settlement conference.  The d/b/a issue
23 is a brand new issue that's being raised based on policy
24 application documents that were reviewed as part of their
25 underwriting process, and apparently they found nothing wrong

with it then.

And certificates of insurance? I'm not sure what that refers to. We did not discuss that.

It seems to me that this is an effort to broaden the scope of this case entirely and it's going beyond the premium calculation, because they're afraid it might not work out for them.

THE COURT: All right.

I have to say, this is new to me too, because I had thought that we were talking about — and had come into this conference expecting that we would be talking about — getting information on where the employees had been placed, getting basically end clients' information, so that we could have a better understanding of where, and whether, and how, premium might have been miscalculated, or had been calculated incorrectly. And I'm still not seeing how the discovery that Wesco seems to want from PSG relates to the incorrect calculation of premium, which is what we've been talking about for the last nine months.

So, let me take a look at what's going on.

I have another conference on at 11:30. What I'm going to do is, I'm going to put the parties' counsel in a breakout room for five minutes, and I'm going to bring you back. During that five minutes, you need to talk about whether you insist, plaintiff, on moving forward, whether you'd like to move

1    forward more on the damage calculation or on this new
2    breach-of-contract issue.  I'm going to bring you back in five
3    minutes, without warning.  I just want to hear what, if
4    anything, you've been able to reach.  Okay?
5             (Recess)
6             THE COURT:  Mr. Costigan, it's your case.  What did
7    you decide?  What have you been able to work out with defense
8    counsel?
9             MR. COSTIGAN:  We discussed it.  Wesco's position is
10   that it would make sense to proceed with discovery of PSG
11   first, which would have the benefit, somewhat at least, of
12   narrowing the subpoenas.  PSG's position is that we should
13   focus solely on the subpoenas.
14            THE COURT:  Okay.  Just a minute.
15            (Pause)
16            THE COURT:  Mr. Shev or Mr. Regelmann, can you
17   respond?  Are there allegations in the complaint that actually
18   speak to this issue?
19            MR. SHEV:  Your Honor, this is Nathan Shev.
20            There are not allegations in the complaint that speak
21   to this issue.  The complaint is about the data that's needed,
22   or that plaintiffs say is needed, to complete a premium audit.
23   And it does not go into other alternative claims,
24   breach-of-contract claims or other state law claims.  That's
25   not part of the case.  So, PSG's view is that we should address

Case 1:18-cv-03771-PGG-OTW   Document 84   Filed 03/09/21   Page 12 of 14    12
L32KWESC

the case that we have.  Party discovery closed in 2019, so, our view is what we've been saying all along — we've been trying to address and resolve how to get the end client data, and we should be focusing on getting that.

            MR. COSTIGAN:  Your Honor, if I may address that — this is Andrew Costigan — at the time that we filed our complaint, the status between the parties was that we were trying to audit PSG, and PSG just flat out refused.  We didn't have anything like the amount of information that we have today.  In particular, we wouldn't have known that we had the issue that we have today, which is trying to obtain client information from companies that were represented as PSG d/b/a's but turned out to be just independent companies.

            THE COURT:  Okay.  But I guess if the breach of contract is the failure to pay premium, I'm just wondering whether this is getting you into a motion to amend.

            MR. COSTIGAN:  It likely is, your Honor, although there is an impact on premium in that the insurance company, in setting the premium -- there's a reason they ask the questions on the application, because they are of some significance to it, and there were two questions that related directly to this issue, and PSG said, on both, it doesn't place its employees with other companies.

            THE COURT:  Okay, all right.

            It looks like the parties for my 11:30 are on the

            SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

1   line.  Here's what I'm going to need to do.  I'm not going to

2   put you in a huge time crunch, Mr. Costigan, but I would like

3   to see a three-page letter filed on the docket basically

4   setting forth your position whether you intend to file a motion

5   to amend the complaint.  Okay?

6        MR. COSTIGAN:  Yes.

7        THE COURT:  Because this is the discovery that you're

8   now seeking, which is not what we had been talking about

9   sometime ago, this is new to me.  So, three pages,

10  single-spaced letter, to be filed on the docket.  There will be

11  no discovery proceeding during this time.  Okay?

12       After I see the letter, I will take a look at the

13  complaint, take a look at your position, Mr. Costigan, and then

14  I think only after that will I either tell you to go forward

15  with your motion to amend or I might invite a short response

16  from defense counsel, but I'm not, at this moment, inviting a

17  response from defense counsel.  Okay?

18       Throughout this time, I direct you to keep the lines

19  of communication open.  If your views change at some point in

20  time, you can also write a letter into the Court and say, you

21  know what, we've discussed it, we've decided that we'd rather

22  proceed with the subpoenas instead of direct discovery from

23  PSG; that's fine, we'll have another conference, we'll talk

24  about the subpoenas.  So, I definitely encourage you to keep

25  the lines of communication open.

L32KWESC

1        I also wanted to say that I am also available to have
2   further settlement conferences, but right now it seems like
3   there is a fundamental disagreement about the direction the
4   parties should be taking going forward, and I'd like to have
5   that resolved or figured out before we start spending big
6   dollars on discovery.  Okay?
7        MR. COSTIGAN:  Yes, yes, your Honor.
8        THE COURT:  Okay, Mr. Costigan, how much time do you
9   need to write that letter?
10        MR. COSTIGAN:  May I have until March 9?
11        THE COURT:  Sure, not a problem.  March 9th.
12        No response is due from defendants at this time.  I
13   will take a look at what the letter says.  And then look for an
14   order on the docket.  Okay?
15        MR. COSTIGAN:  Yes.  Thank you, your Honor.
16        MR. SHEV:  Thank you, your Honor.
17        THE COURT:  Thank you very much.  We are adjourned.
18                              * * *